OPINION
{¶ 1} Edison Applegate appeals from his convictions in the Dayton Municipal Court of one count of domestic violence and one count of assault. Applegate was sentenced to a term of six months on the domestic violence charge, with ninety days *Page 2 
suspended and thirty-seven days jail credit, to be served consecutively with the six months imposed on the assault conviction. Applegate contends his convictions are against the manifest weight of the evidence.
 {¶ 2} Officer Chad Knedler of the Dayton Police Department testified that he responded to 827 Wilmington Avenue, Apartment No. 4, on the report of domestic violence. Knedler testified he went to the rear of the apartment building and Officer Karen Clark went to the front of the building. Knedler testified as he walked up the steps he found the victim, Cassandra Ostrander, sitting in the stairwell with several neighbors and she was crying hysterically. Knedler then testified as follows on direct examination:
 {¶ 3} "Q: And when you say crying hysterically, what do you mean?
 {¶ 4} "A: It took me several attempts to find out if she was, what her name was and what was going on. I had to tell her calm down. She then began talking once she calmed down a little bit.
 {¶ 5} "Q: OK Did you notice what type of shape she was in? We heard other testimony that her makeup was running, I mean what did her clothes look like, what did her hair look like?
 {¶ 6} "A: She's wearing a mini skirt which was hiked up very high where it was exposing her underwear. Her shirt was, she had a tank top on with one of the arms of the tank top off almost exposing her breast area; bent over at the waist onto the steps holding her belly. I asked her what's going on, she says, he beat my ass again, as she's holding her belly.
 {¶ 7} "Q: And then what happened? *Page 3 
 {¶ 8} "A: I asked her who and where is he at? She said Eddie then she pointed to the apartments that he jumped out the window.
 {¶ 9} "Q: And did you go look at that window?
 {¶ 10} "A: Yes I did.
 {¶ 11} "Q: OK what level is this, is this like a two story, three story?
 {¶ 12} "A: It's a second story, but the first floor is halfway under ground, so its basically a floor and a half off the ground.
 {¶ 13} "Q: All right so is the jump from the window plausible?
 {¶ 14} "A: Definitely.
 {¶ 15} "Q: So what happened then after she said these things what did you do then?
 {¶ 16} "A: I asked her if she needed a medic, if she was hurt. She was still crying and she said no, she didn't want a medic. I obtained who had done the offense to her, I asked her what exactly happened, she said that her and her live-in boyfriend got in an argument, she wanted to leave, he refused to let her leave, choked her around the neck, threw her to the ground, didn't let go until the neighbors pound [sic] on the door. Once the neighbors pound [on] the door he jumped out the door.
 {¶ 17} "Q: What did you do then after she said these things?
 {¶ 18} "A: I asked her if she'd fill out a domestic violence witness statement. She refused. I asked her why, she stated that her boyfriend just got off, I believe she said he was out on bail and she didn't want him to go back. *Page 4 
 {¶ 19} "Q: What did you do next?
 {¶ 20} "A: We completed a domestic violence packet without her statement, asked her again if she wanted to go to the hospital, she refused and she said she just wanted to call a friend.
 {¶ 21} "Q: OK. Did you tell her she had to leave?
 {¶ 22} "A: No.
 {¶ 23} "Q: Did she end up calling a friend?
 {¶ 24} "A: Yes she did.
 {¶ 25} "Q: Do you recall where or well you took her home or you took her to that place that evening.
 {¶ 26} "A: Yes Ma'am.
 {¶ 27} "Q: Is that correct? And do you recall why it was this specific place?
 {¶ 28} "A: She told me that's that [sic] only place that her boyfriend didn't know the address or the phone number and couldn't get to her there.
 {¶ 29} "Q: OK your Honor I don't believe I have any other questions for this witness."
 {¶ 30} (T. 23-25.)
 {¶ 31} On cross-examination, Officer Knedler admitted he did not see any visible injuries on Ms. Ostrander's neck or anywhere else on her body.
 {¶ 32} Officer Karen Clark testified she accompanied Officer Knedler to the victim's apartment building. She testified she covered the front of the building in case *Page 5 
the suspect attempted to leave from the front. She said she observed an open window but no suspect. Clark said she then went to the rear of the apartment and observed Ostrander who was crying. Clark said she asked the victim what happened and she said the defendant and she had an argument and he pushed her on the ground and choked her. Clark testified she asked Ms. Ostrander if she wanted to press charges but she did not want to do so. Clark said Ostrander asked for a ride because she was adamant about leaving the apartment. She testified she did not observe any marks on the victim's neck.
 {¶ 33} Cassandra Ostrander testified she lived at the Wilmington address with her fiancÉ, Edison Applegate, and their daughter. She testified she got into an argument with the defendant and he left the apartment. She testified she did not call the police and the defendant was not violent with her. She testified the defendant never hit her or choked her on the night in question.
 {¶ 34} The defendant testified in his own defense and, while admitting he had a disagreement with Ms. Ostrander on the date in question, he denied ever hitting, pushing or choking her.
 {¶ 35} The discretionary power to grant a new trial because the trial court's judgment is against the manifest weight of the evidence should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. State v. Thompkins (1997),78 Ohio St.3d 380, 387.
 {¶ 36} In this case, the evidence does not weigh heavily against Appellant's conviction. Police were called to the defendant's apartment because of a heated *Page 6 
argument between the defendant and his fiancÉ, Ms. Ostrander. When police arrived, both officers observed the alleged victim in disarray, and who claimed, in an excited state, that the defendant had grabbed her and choked her. Officer Kendler testified the victim stated, "he beat my ass again."
 {¶ 37} The evidence presented by the State supports the defendant's conviction for the crime of domestic violence which requires proof that the defendant knowingly caused or attempted to cause physical harm to a family or household member in violation of R.C. 2919.25(A)(1). The defendant was also charged with assault, a violation of R.C. 2903.13(A) in that he knowingly caused or attempted to cause physical harm to another or another's unborn, to-wit: Cassandra Ostrander, by pushing or choking her. In this case, the commission of the domestic violence charge at once convicted the defendant of the assault charge. R.C.2941.25(A) provides that when an accused's conduct can be construed to amount to two or more offenses of similar import, a defendant may be charged with all such offenses but may be convicted of only one. The trial court committed plain error in convicting and sentencing the defendant on both offenses. The Appellant's conviction for assault is hereby Reversed. Appellant's conviction for domestic violence is Affirmed. The judgment of the trial court is Affirmed, in part, Reversed, in part, and Remanded to the trial court for re-sentencing.
 FAIN, J., and GRADY, J., concur. *Page 1